UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

MAR - 5 2010

Clerk, U.S. District and
Bankruptcy Courts

RIZWAN KHALIQ
9116 Acadia Park Drive
Bristow, Virginia 20136

And

JENNY CHRISTIANA LOVBLOM          Case: 1:10-cv-00356
9116 Acadia Park Drive            Assigned To : Bates, John D.
Bristow, Virginia 20136           Assign. Date : 3/5/2010
                                  Description: PI/Malpractice

     Plaintiffs

V.                                Civil Action No.

REPUBLIC OF SUDAN
Ministry of External Affairs
People's Palace
Khartoum, Sudan

And

MINISTRY OF THE INTERIOR
OF THE REPUBLIC OF THE SUDAN
People's Palace
Khartoum, Sudan

And

THE ISLAMIC REPUBLIC OF IRAN
Ministry of Foreign Affairs
Khomeini Avenue
United Nations Street
Tehran, Iran

And

THE IRANIAN MINISTRY
OF INFORMATION AND SECURITY
Pasdaran Avenue
Golestan Yekom
Tehran, Iran

     Defendants

1

## COMPLAINT

(1)    This action is brought by the Plaintiffs, Rizwan Khaliq and Jenny

Christiana Lovblom, by counsel, in their individual capacity pursuant to

the Anti-Terrorism Amendments to the Foreign Sovereign Immunities Act.

(28 United States Code Section 1602 et seq.), and the laws of the

jurisdiction of residence of those suffering physical injuries as hereinafter

alleged. This Court exercises subject matter jurisdiction in accordance

with the provisions of 28 United States Code Sections 1330(a), 1331,

1332(a)(2), and 1605A. The Court exercises in personam jurisdiction over

the parties designated as Defendants in accordance with the provisions of

28 United States Code Section 1605A. Venue in this Court is proper in

accordance with the provisions of 28 United States Code Section

1391(f)(4), which provides in pertinent part that a civil action against a

foreign state may be brought in the United States District Court for the

District of Columbia.

(2)    Section 1083 of Public Law 110-181, signed by President Bush on January

28, 2008, amended the Foreign Sovereign Immunities Act, (28 U.S.C. §

1602, et seq.) extending the statute of limitations for Plaintiffs to a date 60

days after entry of judgment in an "action arising out of the same act or

2

incident..." which was "timely commenced under section 1605(a)(7)[1]

There are presently pending before this Court the following actions

arising out of the same act or incident which were timely filed pursuant to

28 U.S.C. § 1605 (a)(7) in addition to Khaliq, et. al. v. Republic of Sudan, et.

al., No. 04-1536 which was timely commenced under section 1605(a)(7):

1) James Owens, et al., v. Republic of Sudan, et al., 01-2244; Judith Mwila,

et al., v. The Islamic Republic of Iran, et al., No. 08-1377; Joyce Abur, et al.,

v. Repbublic of Sudan, et al., No. 02-1188; and Milly Amduso, et al., v.

Republic of Sudan, No. 08-1361.  There has been no entry of judgment in

any of these cases.


(3) Plaintiffs, Rizwan Khaliq and Jenny Christiana Lovblom are citizens of

the United States who suffered physical injury as a result of the terrorist

attacks upon the Embassies of the United States located in Nairobi, Kenya,

Dar Es Salaam, and Tanzania on August 7, 1998, and more specifically in

this case the attack on the Embassy in Nairobi, Kenya.  These attacks were

carried out by Khalafan Khamis Mohamed, a member of the al Qaeda

terrorist group, headed by Usama Bin Laden, which group, together with

the Lebanese terrorist group Hezbollah, was given, inter alia, cover,

sanctuary, technical assistance, explosive devices and training by the

Defendants, the Islamic Republic of Iran, the Iranian Ministry of

Information and Security, the Republic of the Sudan and the Ministry Of

---

[1] Referring to 28 U.S.C. §1605(a)(7).

3

the Interior of the Republic of Sudan.  As a result of these actions, as

herein more fully set forth below, a number of American Nationals,

Tanzanian Nationals and Kenyan Nationals were killed or injured. The

Plaintiffs above described were, at all times relevant to this Complaint,

American Nationals as that term is defined in section 101(a)(22) of the

Immigration and Nationality Act.  Plaintiffs, Rizwan Khaliq was a civilian

employee of the United States Government engaged in his duties at the

time of the events alleged herein.  Plaintiff Jenny Christiana Lovblom at

the time of the events alleged herein was Plaintiff Rizwan Khaliq's wife

and was living in Kenya with Plaintiff Rizwan Khaliq.

(4) The Defendants, the Islamic Republic of Iran and the Republic of

Sudan, are foreign states which were at the time of the acts hereinafter

complained of and are to the present designated as state sponsors of

terrorism pursuant to Section 6(j) of the Export Administration Act of

1979 (50 United States Code Appendix, Section 2405(j)).

(5) The Defendant, the Iranian Ministry of Information and Security, is an

agency of the Defendant, the Islamic Republic of Iran. The Defendant, the

Ministry of the Interior of the Sudan, is an agency of the Defendant, the

Republic of the Sudan.  The activities of these two agencies included, at all

times relevant to this action, the prosecution of terrorist acts directed

against the nationals of the United States, by and through provision of

material support to various terrorist organizations including "Al Qaeda"

and "Hezbollah". The Defendants, through their agents, officials and

4

employees, who acted within the scope of their employment or agency, aided and abetted and conspired with those who carried the attacks described below.

(6) Hezbollah is an organization of Lebanese Muslims who are adherents of the Shia or Shiite faction of Islam. It represents itself as "an Islamic freedom fighting movement" which views any presence of the United States in the Near East as contrary to the religious beliefs of its members. It advocates the expulsion of the United States from the Near East, and is committed to violent action to that end. At all times relevant to this action, Hezbollah was given extensive support by the Defendants which permitted it to carry out a wide ranging program of terrorism against the United States. At the time of the acts, which give rise to this action, Hezbollah was under the complete operational control of those Defendants, through Iranian Revolutionary Guards units.

(7) Al Qaeda is an organization of Muslim extremists, which has been designated as a terrorist group by the United States Department of State. It operates world wide with the avowed purpose of bringing about the destruction of the United States by violent means.

(8) The Defendant, the Ministry of the Interior of the Republic of the Sudan, is an agency of Defendant, the Republic of the Sudan. Its activities at the time of this occurrence included the support of terrorist activities directed against

foreign targets by terrorist groups operating with cover of the Republic of the Sudan.

(9) The Defendant, the Republic of Sudan, acting through the Defendant, the Ministry of the Interior of the Republic of the Sudan, entered into an arrangement with al Qaeda and Hezbollah under which those organizations received shelter and protection from interference while carrying out planning and training of various persons for terrorist attacks, including the attacks of August 7, 1998.  These included an organizational and planning meeting within the Republic of the Sudan of Usama Bin Laden, chief of Al Qaeda, and Imad Mughaniyah, chief of Hezbollah's terrorist activities, with the purpose of planning and carrying out the attacks upon the embassies of the United States in Dar Es Salaam, Tanzania and Nairobi, Kenya, which occurred on August 7, 1998.  More specifically, Plaintiffs allege:

a) In the early 1990s, the government of Sudan sent overtures to Bin Laden and Al Qaeda, inviting the group to relocate en mass from Afghanistan to the Sudan.  Jamal Ahmed Al-Fadl, a top Al Qaeda lieutenant who served Bin Laden in Afghanistan as well as the Sudan, learned of the impending relationship between Al Qaeda and the Sudanese government for the first time at one of the meetings in Peshwar, Pakistan that occurred between the Sudanese government, Bin Laden and other Al Qaeda members.  The representatives of the Sudanese government, promised the support of that government should Al Qaeda come to the Sudan.  Al Qaeda thereafter used

Sudanese Airways planes to ferry anti-tank rockets and Stinger missiles from Afghanistan to the Sudan.

b) The government of the Sudan is run by President Field Marshall Omar Hassan al-Bashir, the head of state of the Sudan, through an alliance of the military and the National Congress Party, formerly the National Islamic Front.

c) Al-Fadl went to the Sudan to secure residential and commercial property for Al Qaeda. The purpose of some of the property was to provide a safe place to train Al Qaeda militants.

d) Essam Al Riddi, a pilot who worked for Bin Laden in 1993, stated that he purchased a plane for Bin Laden; oversaw its refurbishment; and flew it to Khartoum in 1993.

e) While Al Riddi stayed in Khartoum, he dined with Bin Laden and had several discussions with him. Bin Laden was staying in a large villa in Khartoum, with an office and a guesthouse. The Sudanese government provided security for Al Qaeda. Fifteen to twenty Sudanese men dressed in Sudanese army fatigues, using jeeps with Sudanese army license plates, were stationed at the villa. Mr. Al-Riddi confirmed that this security function was carried out by the Government of Sudan.

f) Al Qaeda provided Al Riddi with a plane from the Sudan Airlines to ferry militants to Nairobi. Bin Laden discussed the possibility of Al Riddi transporting some Stinger missiles from Pakistan to the Sudan.

g) Bin Laden assured him that the Sudanese and Pakistani intelligence agencies would cooperate with the weapons transfer.

h) The training that Al Qaeda engaged in the Sudan included explosives training. The loud noises drew the local police after complaints from neighbors and Al Fadl was among those arrested. He was quickly released, due to the close relationship between Al Qaeda, and the Sudanese intelligence service, a Defendant in this action. According to Al-Fadl:

> [W]e call the intelligence office because we have relationship with them, and the intelligence office came and they tell the local police we take care of that, and don't worry about that. And they take us to the jail, and they say you shouldn't do that, we tell you to refresh[2], not to make real explosives.

i) Al-Fadl saw a letter from President al-Bashir that explained the relationship between Al Qaeda and the Sudanese intelligence. With the explicit approval of Bin Laden, Al-Fadl also personally worked with the Sudanese intelligence officers.

j) The Sudanese intelligence officers and government officials, at all times, acted within the scope of their office or agency during the activities described in this Complaint.

k) The intelligence officers were organized into a "delegation office" to meet the needs of the Al Qaeda group in the Sudan. There was an explicit fear that agents from foreign governments or informants would disclose Al Qaeda's

---

[2] **"Refresh" meant refresher courses for the militants who had already received training in the past.**

location and activities in the Sudan.  Some of these informants were consequently jailed in the Sudan.  Al-Fadl would identify suspicious foreigners to the Sudanese intelligence as Al Qaeda sought to keep its presence and activities in the Sudan secret.

l)   The delegation office, staffed with Sudanese intelligence officers, also helped provide security for Al Qaeda and facilitated the movement of weapons in and out of the country.  On one particular trip, the weapons were taken out of the country by delivering four crates of weapons to a hangar at a Sudanese military base, and then to a port facility owned by the Sudanese army.

m)  The letter from President al-Bashir was absolutely essential to the operations of the Al Qaeda terrorist group, which was secretly training in the Sudan. The letter allowed Al Qaeda members, such as Al Fadl, to bypass tax and customs collection on international shipments and guaranteed their shipments, coming or going, would not be inspected.

n)   Weapons and explosive shipments moved through a quay protected by the Sudanese military in Port Sudan into a barracks used by Sudanese armored and mechanized infantry.  The letter would allow shipments from overseas to bypass inspection at a port and then travel back to Khartoum without inspection by the local police at the numerous checkpoints along the way.

o)   The delegation office, the Sudanese government's go-between with Al Qaeda, also protected Al Qaeda members, such as Al-Fadl, from the interference of Sudanese immigrations office at the airport.  This was important because if Al Qaeda members were caught abroad and their passports were stamped

with Sudanese immigration markings, it would be clear to foreign agents where the organization was located.

p) Al Qaeda also set up a number of companies that provided it with critical income so that it to continue its growth and evolution into a lethal organization with global reach.  However, Al Qaeda did not come to Sudan to operate as a regular capitalist enterprise.  Rather, the purpose of the investment in Sudanese business activity was as adjunct to its mission of aggression against the West, as explicitly stated by Bin Laden himself:

[O]ur agenda is bigger than business.  We not going to make business here, but we need to help the government and the government help our group, and this our purpose.

q) Among the Sudanese companies founded by Al Qaeda were: Laden International Company for import and export; Taba Investment for currency exchange; Hijra Construction Company, which built the largest road existing in Sudan; and the Al Themar al Mubaraka, which ran the farm where Al Qaeda trained its militants in explosives.  The Hijra Construction Company purchased explosives for its road and bridge building activities.

r) Al Qaeda also had extensive holdings in Khartoum, including business offices, guesthouses, farms and residential houses.  Bin Laden even had a bank account in Khartoum in his true name.  Al Qaeda purchased some of the companies directly from the Sudanese government.  The funding that these companies provided to Al Qaeda was critical to its survival and continued existence. At a meeting, which included Bin Laden, the fluctuation of

10

Sudanese currency caused great concern as most of Al Qaeda's income was derived from this business activity.

s)  Al Qaeda's position regarding the United States was known to the world by 1992 when Bin Laden issued a fatwa against the United States due to its presence in the Gulf region during the First Gulf War and its actions in Somalia.  The discussion surrounding the fatwa included an explicit allowance for the murder of innocent civilians. Al Qaeda provided support to terrorist groups in Somalia, Yemen, the Philippines, Tajikistan, and Pakistan, among others.

t)  The partnership forged with the Sudanese government derived benefits for both parties in the manner of a business partnership.  The Sudanese government employed Al Qaeda to manufacture chemical weapons in a section of Khartoum, called Hilat Koko, for use in the genocidal campaign in the southern Sudan.  Al-Fadl traveled to the chemical weapons manufacturing area with a Sudanese military officer, who explained the need for chemical weapons by the Sudanese government.

u)  Al Qaeda also provided communications equipment and Kalishnikov rifles for the Sudanese army, founded by the Islamic National Front, to fight the Christian rebels in the south.  Al-Fadl, as part of this arrangement, also worked directly for the Sudanese government.  For example, a Sudanese intelligence office who also worked in the immigration office, approached Al-Fadl and asked him to spy on a government opposition leader.  Al-Fadl arrested the opposition leader and tried to turn him away from his work

against the Sudanese government. The Sudanese intelligence officer advised Al-Fadl to lie to the opposition leader, to tell him that Al-Fadl had quit Al Qaeda and had stopped working with the government. Al-Fadl reported back to the head of the delegation office, the group of Sudanese intelligence officers that protected Al Qaeda; facilitated communications with the Sudanese government; and provided logistical support.

v)   Dr. Abdullah Mohamed Yusef, a member of the Islamic National Front, through which President al-Bashir ran the Sudanese government, organized travel, documents and funneled economic aid to Al Qaeda while it was located in the Sudan.

w)   Al Qaeda entered into a transaction to purchase uranium through the former President of the Sudan, currently an officer in the Sudanese army. The quality of the uranium was tested in Hilat Koko, the section of Khartoum where the government was partnered with Al Qaeda in the manufacture of chemical weapons. Al-Fadl discussed the uranium test with a member of the Sudanese government, whose brother "runs" the building where the chemical weapon manufacture was housed.

x)   Without the material support, assistance, and aid provided by Sudanese government officials acting within the scope of their agency, employment or office, Al Qaeda could not have carried out the United States embassy bombings that caused plaintiffs' injuries. Such material support, assistance, and aid fits within the definition of material support as described by 18 U.S.C. § 2339A.

y) The defendants not only knew that Al Qaeda was attempting to conceal itself in the Sudan, but facilitated and furthered Al Qaeda's concealment through the activities of the Sudanese intelligence services. The scale of support that defendants furnished Al Qaeda was substantial. The regime invited Al Qaeda to roost in the Sudan and knew of, at least from 1992 onward, Al Qaeda's anti-US crusade.

z) The then and current regime of Sudan explicitly allied itself with Al Qaeda for no legal or moral purpose. The regime conspired with Al Qaeda in the manufacture of weapons and training of terrorists, all the while knowing of Al Qaeda's anti-US crusade. The provision of support to a terrorist organization is illegal and unlawful. The explicit purpose of their agreement was to make each stronger. The US Embassy bombings greatly enhanced Al Qaeda's worldwide reputation and attracted money, recruits and support from those allied against the United States. Sudan carried out these acts knowing of Al Qaeda's program of terrorist attacks against American and other targets.

(10) Acting upon its knowledge of the attacks about to be carried out by those with whom it had conspired, the Defendant, the Islamic Republic of Iran, withdrew its diplomatic personnel from both Dar Es Salaam and Nairobi on August 6, 1998. The next day the attack was carried out against the American embassies in both locations. At Dar Es Salaam, the American embassy was attacked through detonation of materials in a truck including TNT, acetelyne cylinder tanks, bags of nitrate fertilizer and a detonator. At Nairobi the American Embassy was attacked

through detonation of materials being transported by truck including a gas enhanced explosive device. The Iranian Ministry of Information and Security, the Iranian agents of the Defendants in operational control of Hezbollah operated with high level technical expertise in the use of explosives which would not have been available to the Al Qaeda operatives in the absence of Iranian participation. The Ministry of the Interior of the Republic of the Sudan provided cover and protection for the organization and training of the persons carrying out the attack as well as venues for these activities.

(11) The actions of the agents and co-conspirators of the Defendants, and those who were substantially aided and abetted by Defendants, as set forth above, inflicted mental distress upon the families of the plaintiffs, who suffered physical injuries, extrajudicial killings, and assault and battery under state common law. The material support rendered to co-conspirators of the Defendants, and those who were substantially aided and abetted by Defendants, fits within the definition of material support as described by 18 U.S.C. § 2339A.

(12) The formation of Hezbollah and its emergence as a major terrorist organization was the product of direct intervention by Iranian operatives, including the Iranian Revolutionary Guards and the Defendant, the Iranian Ministry of Information. The above referred to activities of Hezbollah were financed, technologically supported and commanded by Iranian military/intelligence operatives.

14

COUNT I
CLAIM OF RIZWAN KHALIQ FOR PERSONAL INJURY
RESULTING FROM ASSAULT AND BATTERY
28 U.S.C. §1605A AND CALIFORNIA COMMON LAW

(13) Plaintiff, Rizwan Khaliq, a resident of the State of California at the time

of the occurrence alleged, repeats and re-alleges each and every allegation set forth

above with equal effect as if alleged herein.

(14) On August 7, 1998, when the explosive device described above was

detonated at Nairobi, Kenya, Plaintiff Rizwan Khaliq suffered severe and permanent

injuries, including but not limited to a permanent loss of hearing, blast burns, severe

lacerations which have resulted in scarring and permanent, and severe post

traumatic stress disorder.  He also suffered injuries including but not limited to:

force and trauma to the body so severe as to cause internal bleeding,; a severed ear;

shrapnel wounds; and blackened gums. His injuries were so severe as to cause

hospitalization for more than one week. He continues to have glass coming out of his

face even today. He suffered seeing colleagues dead all around him, and himself

woke up after the blast in a pool of blood. The explosion was intended to cause

harmful contact with plaintiff and put him in reasonable apprehension of imminent

battery.  These injuries were caused by a willful and deliberate act of persons who

had been materially assisted by Defendants for the purpose of inflicting physical

injuries upon this Plaintiff and others and by so doing to intimidate the United

States, and to cause its withdrawal from the Near East and Africa. Those persons

were at all times acting with the material support of the Defendants and with the

concurrence of the Defendants, the Islamic Republic of Iran, the Iranian Ministry of

Information and Security, the Republic of the Sudan and the Ministry of the Interior of the Republic of the Sudan.

(15) As a direct and proximate consequence of the intentional acts of the agents of the Defendants as above set forth and the injuries thereby inflicted, Plaintiff, Rizwan Khaliq has been required to undergo extensive medical treatment, nursing care, and other treatment, for which he has been required to expend funds, has occasioned a loss of wages and has endured great pain and suffering, and has thereby suffered damages in the amount of $10,000,000.00.

WHEREFORE, Plaintiff, Rizwan Khaliq, demands judgment jointly and severally, against the Defendants, the Islamic Republic of Iran, the Republic of the Sudan, the Ministry of the Interior of the Republic of the Sudan and the Iranian Ministry of Information and Security, in the amount of TEN MILLION DOLLARS ($10,000,000.00), besides costs.

<u>COUNT II</u>
<u>CLAIM OF RIZWAN KHALIQ AND JENNY CHRISTIANA LOVBLOM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS PURSUANT TO 28 U.S.C. §1605A AND CALIFORNIA COMMON LAW</u>

(16) Plaintiffs, Rizwan Khaliq and Jenny Christiana Lovblom, repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

(17) As a direct and intended consequence of the intentional and reckless actions of the Defendants, conduct that is intolerable in a civilized society, the

Islamic Republic of Iran, the Republic of Sudan, the Ministry of the Interior of the

Republic of Sudan and the Iranian Ministry of Information and Security, their co-

conspirators and those who were substantially aided and abetted by Defendants

who carried out the attacks above alleged, the Plaintiffs, Rizwan Khaliq and Jenny

Christiana Lovblom, the wife of Rizwan Khaliq who was in the zone of danger, and

who suffered both mental and physical injury, were caused severe mental distress,

which has required continuing treatment, which will continue for the balance of the

Plaintiffs' lives, and they have thereby suffered damages each in the amount of

$20,000,000.00.

WHEREFORE, Plaintiffs, Rizwan Khaliq and Jenny Christiana Lovblom

demand judgment jointly and severally, against the Defendants, the Islamic Republic

of Iran, the Republic of the Sudan, the Ministry of the Interior of the Republic of the

Sudan and the Iranian Ministry of Information and Security, each in the amount of

TWENTY MILLION DOLLARS ($20,000,000.00), besides costs.

COUNT III
SOLATIUM CLAIM PURSUANT TO
28 U.S.C. §1605A FOR INTENTIONAL
INFLICTION OF EMOTIONAL DISTRESS

(18) Plaintiff, Jenny Christiana Lovblom, repeats and re-alleges each and

every allegation set forth above with like effect as if alleged herein.

(19) As a further and direct proximate result of the acts of the Defendants, the

Islamic Republic of Iran, the Republic of the Sudan, the Ministry of the Interior of the

Republic of the Sudan and the Iranian Ministry of Information and Security, the

plaintiff, Jenny Christiana Lovblom, the wife of the Plaintiff, Rizwan Khaliq, has

17

suffered extraordinary grief and mental anguish through infliction of physical injury and emotional distress and suffering on her husband Rizwan Khaliq, which was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community. Jenny Christiana Lovblom has suffered damages in the amount of ten million dollars ($10,000,000.00), besides costs.

**WHEREFORE**, Plaintiff, Jenny Christiana Lovblom, demands judgment jointly and severally against the Islamic Republic of Iran, the Republic of the Sudan, the Ministry of the Interior of the Republic of the Sudan and the Iranian Ministry of Information and Security, in the amount of TEN MILLION DOLLARS ($10,000,000.00), besides costs.

<u>COUNT IV</u>
<u>PUNITIVE DAMAGES</u>
<u>28 U.S.C. §1605A</u>

(20) Plaintiffs, Rizwan Khaliq and Jenny Christiana Lovblom repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

(21) The actions carried out with the material support, knowledge and assistance of the Defendants, the Islamic Republic of Iran, the Republic of Sudan, the Ministry of Interior of the Republic of the Sudan and the Iranian Ministry of Information and Security, by their agents as described above, were malicious, willful, unlawful, and in wanton disregard of life and the standards of law which

govern the actions of civilized nations. The injuries and loss of life, as above described, were intended as a result by each Defendant. The actions of those who carried out the attack described, were within the scope of their agency on behalf of the Defendants. In accordance with the provisions of Public Law 104-208, Div. A, Title I, Section 101 ( C ) each plaintiff is thereby entitled to punitive damages.

WHEREFORE, Plaintiffs Rizwan Khaliq and Jenny Christiana jointly pray that judgment be entered, jointly and severally, against the Islamic Republic of Iran, the Republic of Sudan, the Ministry of Interior of the Republic of the Sudan and the Iranian Ministry of Information and Security, in the amount of ONE BILLION DOLLARS ($1,000,000,000.00), besides costs, upon collection the amount in punitive damages to be distributed to each Plaintiff in the proportion that the compensatory damages awarded to that Plaintiff bears to the total compensatory damages awarded pursuant to this Complaint.

March 5, 2010                          Respectfully submitted,


_____
Jane Carol Norman
Unifed Bar No. 384030
Bond & Norman PLLC
777 Sixth St. NW #410
Washington, DC 20001
202-682-4100
Fax: 202-207-1041


Counsel for Plaintiffs